IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MJT SECURITIES, LLC,

    Plaintiff,

  v.

THE TORONTO-DOMINION BANK; TD OPTIONS, LLC; and DOES 1 through 25,

    Defendants.

                                  /

No. C 03-3815 CW

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Defendants The Toronto-Dominion Bank (TD Bank) and TD Options, LLC move for summary judgment on the sole remaining cause of action and the sole remaining remedy in this case. Plaintiff MJT Securities, LLC opposes the motion. The matter was heard on May 10, 2007. Having considered the parties' papers, the evidence cited therein and oral argument, the Court grants Defendants' motion.

BACKGROUND

    Market-making is one form of options trading; it involves the buying and selling of option contracts, or issues, in the stocks of

particular companies. During the relevant time, there were four trading floors where issues were traded: the Chicago Board Options Exchange (CBOE), the American Stock Exchange (AMEX) in New York, the Philadelphia Stock Exchange (PHLX) and the Pacific Exchange (PCX). Issues were routinely listed on multiple exchanges. This created competition for "order flow," which refers to the volume of options contracts sent to market makers from order flow providers such as Charles Schwab and other brokers. To attract order flow to their respective exchanges, the exchanges designated for each issue a lead market maker (LMM), also called a designated primary market maker or specialist. The appointed LMM would have certain obligations to provide liquidity in the market and certain rights to a percentage of the order flow; ordinary market makers did not have these rights and obligations. Depending on market conditions and the skill of the trader, an LMM could make higher profits, and incur great losses, than an ordinary market maker.

MJT, an options trading business on the Pacific Exchange, was founded over a decade ago. Its principals are L. Matthew Adams and John Brown. In 1998, the PCX appointed MJT as a LMM. The PCX later allocated a significant number of issues to MJT.

MJT had a very good year in 1999. But the next year it was losing millions of dollars. By September, 2000, it had lost between five to ten million dollars. It was concerned that, if it did not find a joint venture partner, it might have to shut down as a LMM.

On September 15, 2000, MJT entered into a joint venture agreement with JSS Investments, LLC, which agreed to contribute

2

needed capital. The agreement transferred the MJT LMM to a joint venture owned seventy percent by JSS and thirty percent by MJT. It further provided that JSS could sell the joint venture's LMM without MJT's approval or consent and would pay MJT an amount equal to thirty percent of the gross sale proceeds. If JSS chose to terminate its relationship with MJT and continue to operate the LMM, JSS would pay MJT thirty percent of the fair market value of the LMM, as mutually agreed between the parties.

The joint venture was not profitable. It is undisputed that between October, 2000 and May, 2001, the joint venture lost thirteen million dollars. In response, JSS removed both Brown and Adams from the trading floor. Brown states that, in June, 2001, JSS effectively banned MJT from any role in the operation or management of the LMM or the joint venture.

During this same period, TD Bank was exploring potential opportunities for United States listed option trading businesses. According to an internal memorandum:

> Establishing a U.S. listed option market making capability will ensure that TD Bank Financial Group is well positioned to maximize the value of its existing and future listed option flow. In addition, given the inefficiencies that continue to exist in the listed option market and recent regulatory changes, a technology based market making platform could result in a compelling value proposition for TD as a standalone business. . . . The main objective of adding a market making capability is to maximize the value of TD Waterhouse's listed option flow.

Cialone Dec., Ex. 11.

In particular, it considered acquiring JSS and The LETCO Group. TD Bank states that JSS's technology was the principal drive behind its eventual acquisition of JSS because it believed

3

1 that the technology would offer a long-term competitive advantage
2 in options trading.  TD Bank's internal deal summaries show that
3 JSS's technology was the most attractive part of JSS's business,
4 more attractive than JSS's on-floor market making.

5     Nonetheless, JSS, like LETCO, had a strong presence on the
6 CBOE and AMEX, the national exchanges with the most profitable
7 order flow.  The PCX and PHLX were regarded as smaller, regional
8 exchanges with lower volume.  Fourteen of the eighteen LMMs that TD
9 Bank anticipated acquiring from JSS and LETCO were on the CBOE and
10 AMEX.  TD Bank believed that the trading revenue generated by order
11 flow on the CBOE and AMEX would be the foundation of its market-
12 making business.  To eliminate any overlapping issues on the
13 different exchanges, TD Bank generally planned to keep the issues
14 on the CBOE and AMEX and trade away the issues on the PCX and PHLX.
15 Thus, TD Bank planned to keep LETCO's Worldcom issue on the CBOE
16 and not MJT's Worldcom issue on the PCX.

17     As part of the potential acquisition, JSS provided TD Bank
18 information about its business and financial results for its
19 various market makers, including MJT.  One document stated that the
20 MJT LMM had lost $1.2 million in 2000, but its earning were
21 expected to escalate to three million dollars in 2001.  Another
22 document, entitled "Explanation of San Francisco DPM (MJT)," stated
23 that MJT's trading resulted in over six million dollars in losses
24 in January and February, 2001, but that this "unfortunate
25 situation" was now under control.  Sommer Dec., Ex. 12.

26     TD Bank created its own forecast based on the information that
27 JSS provided, which included a footnote stating that excluded from

4

the 2001 projections was a "one time loss on PCX of $6.8 million." Although TD Bank was concerned about the MJT LMM losses, it could shut down the LMM if the losses continued post-acquisition.

While TD Bank was negotiating with JSS and LETCO, JSS's relationship with MJT continued to deteriorate. In August, 2001, MJT sent a letter to John S. Stafford, the managing member of JSS, that stated that JSS's actions constituted a constructive termination and repudiation of the joint venture agreement. It demanded that, pursuant to the LMM, JSS pay it an amount equal to thirty percent of the fair market value of the LMM as of June 7, 2001. JSS responded a week later and rejected MJT's demand that it be compensated, contending that the joint venture had not been terminated, constructively or otherwise. In addition, JSS informed MJT that it was beginning arbitration proceedings against it to collect $414,785.72. In September, 2001, MJT filed counterclaims in that arbitration, contending that JSS had terminated the joint venture agreement on May 18, 2001, the date that JSS prevented Brown and Adams from participating in the joint venture, and further that JSS breached its fiduciary duty and the duty of good faith and fair dealing.

On December 3, 2001, MJT's counsel sent a letter again asserting that JSS's actions were consistent with a termination of the joint venture agreement. The letter noted that MJT was aware that JSS and TD Bank were meeting to discuss the acquisition of the LMM owned by JSS and MJT and requested that MJT have an opportunity to meet with representatives of TD Bank and LETCO. JSS's attorneys responded that, although they would inform MJT about any ultimate

5

1  resolution of the negotiations involving the LMM, it was not
2  appropriate for MJT to be involved with the discussions.  MJT never
3  met with anyone from TD Bank or LETCO, nor did it contact TD Bank
4  or have any involvement in the acquisition of the LMM.
5       That same day, TD Bank's counsel sent an email to JSS's
6  counsel summarizing TD Bank's understanding with respect to MJT and
7  other market makers that were to be sold as part of the JSS sale.
8  TD Bank's understanding with respect to MJT was as follows:

> M.J.T. Securities transferred its PCX LMM appointment to JSS in late 2000 pursuant to a joint venture agreement under which M.J.T. retained a P&L split.  The joint venture was terminated by JSS in May 2001 because of significant trading losses.  JSS has commenced an arbitration against M.J.T. in respect to the losses.  M.J.T. has counterclaimed for defamation and breach of fair dealing.  The hearing will likely occur in the summer or fall of 2002.  The Sellers to retain the losses, and indemnify TD Option. . . . Notwithstanding termination of the joint venture, the LMM appointment remains with JSS.  Under the agreement, JSS is to pay M.J.T. 30% of the gross proceeds from a sale of the Specialist unit.  We understand that the Sellers will determine the allocation of purchase price to this Specialist unit and 30% of this allocation is, therefore, for the account of M.J.T.  The Sellers intend to offset against this amount an equivalent amount of M.J.T.'s outstanding liability for the trading losses.

18 Cialone Dec., Ex. 15.
19      The next day, JSS's counsel responded:

> Correct, with the following exceptions: The joint venture has not been terminated by JSS.  Rather in May, 2001, Brown and Adams, the Principals of MJT, were relieved of their trading responsibilities.  JSS has carefully avoided terminating the Joint Venture Agreement.  MJT claims, in the arbitration proceeding, that JSS has "constructively terminated" the Joint Venture Agreement, and we disagree.

24 Id. at Ex. 16.
25      TD Bank then responded that it thought "that the situation
26 would be much cleaner if the joint venture was terminated."  Id.
27 But, given JSS's response, it assumed "that there are reasons why

6

1 this has not been done." Id. TD asked JSS to explain why
2 termination would not be desirable. Id.

3     On December 12, 2001, JSS's counsel sent an email to TD Bank's
4 counsel informing him that, since they had talked two days before,
5 he had talked with JSS concerning TD Bank's preference that the
6 joint venture agreement between JSS and MJT be terminated prior to
7 the JSS-TD Bank transaction. Cialone Dec., Ex. 18. He expounded,

> If we sell the LMM, in a separate transaction to TD (or a TD affiliated designated by TD) for the sum of $500,000, then JSS would owe 30% of that amount or $150,000 to MJT, which we would acknowledge . . . . The overall purchase price paid by TD in acquiring the Stafford entities would be reduced by a corresponding $500,000. Based upon information we are receiving of recent transactions involving the purchase and sale of LMMs on the PCX, we believe this valuation is very supportable and, in fact, an argument could be made that it should be less, but in order to avoid any disagreement with MJT in the arbitration we are willing to be as fair as possible in determining its value of $500,000. We have asked the head of our San Francesco office to contact the PCX and do an analysis of recent purchases/sales of LMMs, get the details, so we can assemble data that will assist in determination of fair market value for our LMM.
>
> What we would propose is a separate purchase agreement . . . with which the exchange staff and legal department are very familiar and routinely approve. John Jr. feels it would be important to sign and close this transaction prior to closing the overall transaction with TD, and if for some reason the overall transaction does not close, we could provide comfort in some fashion to TD that we would repurchase the LMM, so TD is not stuck with a single LMM.

21 Id.

22     At some point during the process, Evan Kimmel, now the
23 president of TD Options, jotted down notes from what appears to be
24 a conversation with JSS's attorney concerning MJT. The note
25 states: "Jason: something ≈ $500K for the PCX." Cialone Dec., Ex.
26 24. Mr. Kimmel explained that he wrote the note because it was the
27 first time he heard the $500,000 figure and he needed to bring it

28     7

the attention of Jason Marks, the "decision-maker." Id. at Ex. 3, 18:7-19:7. Also included on his notes, with a circled star next to it: "How best to determine the value of the LMM??" Id.

On December 21, 2001, TD Bank and JSS signed a Master Purchase Agreement, which provides:

> Before the Closing Date, JSS shall cause the Joint Venture Agreement made September 15, 2000 ("the MJT JV Agreement") by and between JSS and M.J.T. Securities, L.L.C. ("MJT") to be terminated, either through a sale of the subject Lead Market Maker business to Buyer [TD Bank] or by voluntary termination thereunder. At the request of JSS, Buyer shall negotiate, both JSS and Buyer acting reasonably and in good faith, an agreement to purchase the subject Lead Market Maker business (the "LMM Purchase Agreement") at a fair market value which shall be mutually agreed upon by Buyer and JSS before the Closing Date.

Cialone Dec., Ex. 20. The language "at a fair market value which shall be mutually agreed upon by Buyer and JSS" did not appear in the original draft; JSS's lawyers requested that the language be added and it was.

TD Bank signed a similar Master Purchase Agreement with LETCO that same day. The JSS purchase price was over $100 million; the combined price for both entities exceeded $200 million. In reaching the purchase prices, TD Bank evaluated the acquired businesses as a whole and did not break the businesses into components. Nonetheless, TD Bank negotiated a reduction in price with both JSS and LETCO after several of their market makers declined to participate in the proposed acquisition. For example, TD Bank initially calculated that the entities it would acquire from JSS would provide coverage of thirty-one percent of TD Waterhouse's order flow. After AGS, a lead market maker on the AMEX, declined to participate, JSS's coverage dropped to nineteen

8

percent. JSS proposed to reduce the amount TD Bank paid to JSS by over twenty million dollars, nearly two million dollar per percentage point of coverage. TD Bank reduced the price even more, which reflected its view that coverage on the AMEX was worth a premium. Likewise, TD Bank reduced its offered price for LETCO by about two million for each percentage point of coverage lost after two of LETCO's market markers refused to participate in the deal.

On February 27, 2002, TD Options, a subsidiary of TD Bank, bought the MJT LMM for $500,000. The $500,000 figure was mutually agreed upon by TD Bank and JSS. TD Banks's corporate representative, Jason Marks, did a "sanity check" on JSS's proposed price of $500,000. He knew that JSS had acquired good listings from a trading group for nothing more than the cost of employment contracts for the traders and that another company sold its issues for $10,000 each. MJT had fifty-one issues that were being transferred to TD Bank. Thus, TD Bank concluded that the $500,000 was reasonable. However, TD Bank was also aware that, a couple months earlier, LETCO had valued the LETCO Omega LMM, which was similar to the MJT LMM, at nearly $4.2 million and another PCX market maker at nearly $8.4 million. Further, TD Bank was aware that, in 2000, MJT provided at least 2.14 percent coverage, although that number dropped to 1.07 percent in 2001. And one of TD Bank's documents purported that the MJT LMM was worth over eight million dollars.

TD Bank acknowledges that it did not perform an individual valuation of the MJT LMM; rather, it relied on its knowledge of issues being sold for $10,000 each and JSS's representation that

9

the amount was fair. It notes that, prior to acquiring the LMM, TD Bank had never traded on the PCX and that it could not obtain data regarding comparable sales from the PCX because such information is not publicly reported. Therefore, it relied on JSS and LETCO to put a price tag on their LMMs.

That same day, JSS sent MJT a letter informing it that JSS had sold the LMM to TD Options for $500,000 and, therefore, with the closing of the sale, which was expected later that week, the joint venture agreement was terminated. Upon closing, JSS would hold $150,000, or thirty percent of the purchase price, in escrow pending the final resolution of the arbitration proceedings. Before JSS sent the letter to MJT, it sent a draft to TD Bank, which made a few minor changes to the letter.

The following day, JSS merged into TD Options.

Shortly thereafter, MJT instituted a new counterclaim in the arbitration with JSS, contending that the $500,000 allegedly paid by TD Options for the MJT LMM was unfair. During arbitration proceedings, MJT introduced testimony from a valuation expert that its LMM was worth seven to ten million dollars. Guy Leung, a thirty percent owner of a PCX LMM, which had approximately sixty issues and which was sold as part of the LETCO transaction, testified that he received $1.25 million for his thirty percent interest.

Throughout the arbitration, JSS took the position that termination of the joint venture did not occur until the MJT LMM was sold to TD Options in February, 2002. MJT, however, argued that the termination occurred in May, 2001. Brown testified that

10

he had no role in the joint venture after May 18, 2000. And, in its closing argument, MJT argued to the panel that it should award MJT thirty percent of the fair market value of the LMM "as of the time of termination, May 18, 2001; or if you find that there wasn't a constructive termination, as of December of 2001." Sommer Dec., Ex. 6 at 154.[1]

In March, 2003, the arbitration panel issued its written decision awarding MJT $1,200,000 for its counterclaims; JSS received nothing for its claims. The panel did not explain its decision.

In July, 2003, MJT filed this suit. Approximately a year later, the Court dismissed with prejudice MJT's first amended complaint. MJT appealed. The Ninth Circuit affirmed the Court's ruling that MJT could not state a claim for interference or seek attorneys' fees, but it reversed the Court's ruling that MJT failed to plead a cause of action for aiding and abetting a fiduciary's breach of trust and remanded for further proceedings.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

---

[1] MJT now states that the joint venture agreement "was terminated coincidentally with the closing of the sale of the LMM, in accordance with the February 27, 2002 letter." Sommer Dec., Ex. 16 at 5.

11

1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or

12

defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

DISCUSSION

Defendants move for summary judgment on MJT's remaining cause of action, aiding and abetting a breach of fiduciary duty, and its remaining remedy, punitive damages. MJT contends that sale of the LMM to TD Options was a sham transaction and that TD Banks knew that, and knew that JSS had a fiduciary duty to MJT, but

13

nonetheless helped JSS breach its duty by going along with the sham transaction.

I.  Aiding and Abetting Breach of Fiduciary Duty

To prove aiding and abetting a breach of fiduciary duty, the plaintiff must first establish an underlying breach of fiduciary duty.  Then the plaintiff must show (1) the aider and abettor's substantial assistance or encouragement in accomplishing the breach of fiduciary duty and (2) the aider and abettor's actual knowledge of that breach that the aider and abetter substantially assisted. See Casey v. U.S. Bank National Ass'n, 127 Cal. App. 4th 1138, 1444, 1448 (2005).  Defendants contend that there is no genuine issue of material fact as to any of those three elements and, therefore, they are entitled to judgment as a matter of law.

There is no dispute that MJT and JSS, as joint venture partners, were in a fiduciary relationship.  But the parties dispute whether they remained in a fiduciary relationship at the time of the sale of the LMM to TD Options.  Defendants point to MJT's previous insistence that the joint venture agreement was terminated in May or June, 2000.  They contend that, as a matter of law, JSS had no fiduciary duty to pay MJT thirty percent of the sale proceeds of the LMM over half a year after termination of the joint venture agreement and, therefore, they could not have aided and abetted a breach of any such duty.

MJT responds that Defendants mistakenly rely on the "irrelevant fact" that in arbitration it argued that the joint venture was constructively terminated in May, 2001.  It notes that it is not judicially estopped from taking an inconsistent position

14

in this litigation. See Interstate Fire & Cas. Co. v. Underwriters at Lloyds, London, 139 F.3d 1234, 1239 (9th Cir. 1998) ("Judicial estoppel precludes a party from taking inconsistent positions in the same litigation."). And it points to facts that it contends establish a disputed fact as to when the joint venture was terminated: in December, 2001, JSS informed TD Bank that, contrary to TD Bank's understanding, JSS had "carefully avoided" terminating the joint venture, and TD Bank assisted JSS in drafting the February 27, 2002 termination letter. Nonetheless, although it contends that the joint venture agreement was "actually terminated" when JSS sent the termination letter, it concedes that the joint venture was "constructively terminated" in May, 2001.

MJT may not be estopped from arguing inconsistent positions, but its statement in its opposition brief that the joint venture agreement was constructively terminated in May, 2001, is an admission of a party and supported by undisputed facts. American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 227 (9th Cir. 1988) ("statements of fact contained in a brief may be considered admissions of the party in the discretion of the district court"). MJT fails to provide any authority to support its distinction between "constructive termination" and "actual termination." And the arguments it made in arbitration, such as that the law looks on constructive termination as a termination, support the conclusion that any distinction is not relevant in this case.

The Court finds that the undisputed facts show that the joint venture agreement was terminated months before the sale of the LMM and, therefore, JSS did not breach any fiduciary duty to MJT.

15

Because there is no underlying breach of fiduciary duty, MJT's aiding and abetting claim fails as a matter of law. Therefore, the Court need not examine the other elements of MJT's claim. Summary judgment in favor of Defendants is granted.

II. Punitive Damages

California law provides punitive damages only in limited circumstances to discourage oppression, fraud, or malice by punishing the wrongdoer. <u>See</u> Cal. Civ. Code § 3294; <u>In re First Alliance Mortgage Co.</u>, 471 F.3d 977, 998 (9th Cir. 2006). Punitive damages are appropriate only where a plaintiff establishes by clear and convincing evidence that the defendant is guilty of (1) fraud, (2) oppression or (3) malice. Cal. Civ. Code § 3294(a).[2] Further, a plaintiff may not recover punitive damages unless the defendant acted with intent or engaged in "despicable conduct." Cal. Civ. Code § 3294(c). A California court instructs, "The adjective 'despicable' connotes conduct that is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon

---

[2]Section 3294(c) provides:

(1) "Malice" means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.

(2) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights.

(3) "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury.

16

and despised by ordinary decent people." <u>Lackner v. North</u>, 135 Cal. App. 4th 1188, 1210 (2006) (internal quotation marks and citations omitted).

As explained in <u>In re First Alliance Mortgage Co.</u>, "Some limited weighing of the evidence is a natural component of determining whether a jury could have reasonably found punitive damages appropriate under the heightened clear and convincing evidence standard."  471 F.3d at 998-99 (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 254-55 (1986)).  Here, viewing the evidence in the light most favorable to MJT, and assuming the joint venture had not been terminated, the Court concludes that a reasonable juror could not find, by clear and convincing evidence, grounds on which to award punitive damages.

Defendants reliance on <u>In re JTS Corp.</u>, 305 B.R. 529 (N.D. Cal. 2003), is misplaced.  There, the court denied summary judgment even though the evidence to support punitive damages was "not strong" because the defendant in that case was a director and fiduciary of the company who tried to get relief from personal debt when the company was insolvent.  Defendants are not, and have never been, the fiduciary of MJT.  Although the evidence MJT provides may be sufficient to support a punitive damages claim against JSS, it is not sufficient to support a punitive damages claim against Defendants.  <u>See</u> <u>In re First Alliance Mortgage Co.</u>, 2003 WL 21530096, *11 (C.D. Cal.) (finding that punitive damages may be appropriate against mortgage lender who owed duty to its borrowers, but not against alleged aider and abettor).

CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (Docket No. 120).[3]  Judgment in favor of Defendants shall enter accordingly.  Defendants shall recover their costs from Plaintiff.

IT IS SO ORDERED.

Dated: 6/14/07

*Claudia Wilken*
CLAUDIA WILKEN
United States District Judge

---

[3] Defendants' requests for judicial notice (Docket Nos. 128 and 144) are also GRANTED.

18